497 So.2d 253 (1985)
John J. CARROLL, Appellant,
v.
The STATE of Florida, Appellee.
No. 82-2565.
District Court of Appeal of Florida, Third District.
December 10, 1985.
On Motions for Rehearing November 18, 1986 and January 27, 1987.
*254 Bennett H. Brummer, Public Defender, and Elliot H. Scherker, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and Calvin L. Fox, Asst. Atty. Gen., for appellee.
Before NESBITT, BASKIN and FERGUSON, JJ.
NESBITT, Judge.
The defendant appeals his conviction of third degree murder, armed burglary and armed robbery without a firearm. We reverse.
The first issue raised by the defendant that we will consider is whether the trial court erred in allowing a prior consistent statement of one of the witnesses to be introduced through the testimony of Detective Parmenter, the lead investigator on this case. To fully resolve this issue, we must consider all the evidence and testimony presented while resolving all conflicts in favor of the prevailing party, the state.
Judy Trevino was the manager of a Sambo's restaurant in Naranja Lakes. The body of the homicide victim was discovered by Trevino in the early morning of February 25, 1981, in a trailer which she had shared with the victim. The victim had been a cook at the Sambo's restaurant managed by Trevino. On the night of the incident, Trevino left for the restaurant at about 9:30 p.m. When she returned at 12:30 a.m., Trevino found the trailer in disarray, numerous items missing, and then discovered the victim's body. The victim's automobile, a brown 1969 Cadillac, was missing from the driveway, where it had been when Trevino had left for work.
The victim died as the result of a single gunshot wound to the left side of the neck, probably inflicted while he was sleeping. Metro-Dade detectives determined that the entry into the trailer had been made through a window of the master bedroom. They discovered a ladder leaning against the wall outside the bedroom. A paper bag containing a Sambo's uniform was found at the base of the ladder.
The uniform in the paper bag was identified as belonging to the defendant who had begun working at Sambo's about four days earlier. The defendant had just moved into a trailer with Rudy Martin, another Sambo's employee. Martin's trailer was located about 300 yards from Trevino's trailer.
Martin's testimony indicated that on the night of the homicide, the defendant left their trailer on his way to work at about 9:30 p.m. The defendant left on foot, as the restaurant was only about four blocks away, and he left carrying his Sambo's uniform in a paper bag. The defendant never reported to work that night. At about 11:00 p.m., the defendant returned to Martin's trailer without the bag and he was not wearing his uniform. The defendant informed Martin he was going to live with his brother and proceeded to gather his belongings. The defendant gave Martin the key to the trailer and departed. Martin testified that just prior to the defendant's return to the trailer he had heard a car drive up, and that when the defendant left the trailer, he heard a car door close and a car drive away. Martin described the car as having "long, skinny taillights ... [and] it looked like a Cadillac."
Glenn Brown, a neighbor of Trevino, testified that he heard a gunshot at approximately 10:00 p.m., February 24, 1981. Upon hearing the shot, Brown went outside his trailer and looked up and down the street. While on the street, Brown saw what he described as a small male's hand twice reach out of the doorway of Trevino's trailer and pull the open door closed. Brown returned to his trailer and shortly thereafter he heard the victim's Cadillac crank up. He indicated that he recognized the sound of the car because "[i]t had a loud sound to it. Like a bad muffler... ." He also indicated that the car sped off in the direction of Martin's trailer.
In addition to this testimony, the state introduced into evidence a pocketknife seized from the defendant when he was *255 arrested in New York.[1] This knife was identified as belonging to the victim and was last seen in the possession of the victim on the afternoon of February 24, 1981. Fingerprints had been lifted during the initial investigation but none matched the defendant's fingerprints. None of the property stolen the night of the homicide was ever recovered. The jury returned verdicts against the defendant finding him guilty of third degree murder, armed burglary and robbery without a firearm.
It is obvious that Rudy Martin's testimony was crucial to the state's case. It was his testimony which indicated that the defendant had left that evening with his uniform in a paper bag; that he had returned later that night without his uniform to gather his belongings and vacate the trailer; and that he left in a car that "looked like a Cadillac." Martin's testimony tied together several elements of the state's case and was an important link in the chain of circumstantial evidence upon which the case against the defendant was based. Martin's testimony at trial, however, was far from consistent.
Martin suffers from a learning disability. He testified at trial that he sometimes has trouble remembering things and expressing himself. At a competency hearing held outside the presence of the jury, the court determined that Martin was competent to testify and could give truthful testimony. The court, however, called Martin as a court witness "in the interest of justice" to allow both sides some latitude in asking leading questions because of Martin's problems with expressing himself.
It is clear from our reading of Martin's testimony that he was highly susceptible to suggestion. On direct examination, Martin testified that he "saw [the defendant] put the uniform in the bag" just prior to the defendant leaving for work with the paper bag on February 24, 1981. In addition, Martin testified that the car outside his trailer when the defendant later returned "looked like it was a Cadillac" because "[i]t had long, skinny taillights." On cross-examination, Martin testified that the defendant "walked out with a paper bag and I saw him put something in it. I don't know what he put in it. It could have been the uniform. It could have been something else." With regard to the car, Martin testified on cross-examination as follows:
Q. Isn't it true that you told the police that you didn't know what type of car it was?
A. I didn't know at the time, no.
Q. So at that time you didn't know what type of car it was?
A. I knew it was a Cadillac that [the victim] had.
Q. But you didn't know what type of car you thought [the defendant] might have driven away in; did you?
A. No.
... .
Q. You testified a minute ago that you know  knew for a fact that it was a Cadillac; right?
A. Yes, it was a Cadillac.
Q. But you just testified that you didn't know what type of car it was; right?
A. Yeah.
Q. So you don't know; do you?
A. No.
On re-direct, the following colloquy took place:
Q. Did you see [the defendant] pick up a brown uniform and put it in a bag?
A. Yes.
... .
Q. Okay, Rudy, my question is: Did you see [the defendant]?
A. Yes, I saw him. I don't know if he put the top or bottom in the bag.
Q. But you saw him put the uniform in the bag?
A. Yes.
Q. You're sure about that?
A. Yes.
Q. Positive?

*256 A. Yeah.
Q. Were you mistaken a few moments ago when you told [defense counsel] that you weren't sure what was in the bag?
A. Yes, sir.
Q. You're sure now?
A. Yes, sir.
On re-cross-examination:
Q. But you don't know what he put in that bag?
A. I think it was a uniform.
Q. But you don't know; do you?
A. I think it was a uniform.
Because of Martin's obvious susceptibility to suggestion, defense counsel during cross-examination raised an implication that the police, when initially questioning Martin, may have unwittingly planted certain information in Martin's mind which at trial he remembered as fact.
In an attempt to bolster Martin's credibility, therefore, the state called Detective Parmenter as a witness immediately after Martin and elicited from the detective statements Martin had given to him on the morning following the homicide. Over the defendant's objection, Parmenter testified that he had spoken with Martin on the morning after the homicide and Martin had told him that the defendant had picked up his uniform and put it in a plain paper bag and left with the bag for work the evening before. In addition, Parmenter testified that Martin had told him that on the defendant's second departure from the trailer that night, the defendant had left in a car with long taillights like a Cadillac.
Prior to the admission of this testimony, defense counsel objected, apparently on the unstated ground of hearsay. The objection was initially sustained and counsel for both the state and the defendant went into a discussion with the court at side-bar. During this side-bar conference, the state argued to the trial court that the testimony was admissible as a prior consistent statement under section 90.801(2)(b), Florida Statutes (1979). The trial court apparently agreed and overruled the objection allowing the testimony into evidence. On appeal, the defendant claims the admission of this testimony improperly permitted the state to bolster the testimony of a critical witness with his prior consistent statement. The state's only colorable argument on appeal in support of the admission of the testimony is that it was admissible under section 90.801(2)(b), Florida Statutes (1979).
The well established rule in Florida is that a witness' trial testimony may not be corroborated by his own prior consistent statement. Van Gallon v. State, 50 So.2d 882 (Fla. 1951); McElveen v. State, 415 So.2d 746 (Fla. 1st DCA 1982); Holliday v. State, 389 So.2d 679 (Fla. 3d DCA 1980); Perez v. State, 371 So.2d 714 (Fla. 2d DCA 1979); Lamb v. State, 357 So.2d 437 (Fla. 2d DCA 1978); Brown v. State, 344 So.2d 641 (Fla. 2d DCA 1977); Roti v. State, 334 So.2d 146 (Fla. 2d DCA 1976); Kellam v. Thomas, 287 So.2d 733 (Fla. 4th DCA 1974); Allison v. State, 162 So.2d 922 (Fla. 1st DCA 1964); Jackman v. State, 140 So.2d 627 (Fla. 3d DCA 1962). The purpose behind the evolution of this rule was stated by the court in Allison:
The salutary nature and the necessity of such a rule are clearly apparent upon reflection in cases like the present, for without that rule a witness's testimony could be blown up out of all proportion to its true probative force by telling the same story out of court before a group of reputable citizens, who would then parade onto the witness stand and repeat the statement time and again until the jury might easily forget that the truth of the statement was not backed by those citizens but was solely founded upon the integrity of the said witness. This danger would seem to us to be especially acute in a criminal case ... when the ... previous out-of-court statement is repeated before the jury by... law enforcement officers.
162 So.2d at 924. In Perez, the court also recognized this particularly acute danger:
The rationale prohibiting the use of prior consistent statements is to prevent "putting a cloak of credibility" on the witness's testimony. [citation omitted] *257 When a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave.
371 So.2d at 716-17.
As with most "general" rules, the inadmissibility of prior consistent statements has been subject to exceptions. It has been generally held that when an attempt has been made to impeach the credibility of a witness, and the basis of the impeachment is such that, in fairness to the witness, evidence of a prior consistent statement would tend to weaken or destroy the force of the impeaching evidence, an exception to the general rule was applicable. Kellam, 287 So.2d at 734. Thus, exceptions to the general rule developed with regard to cases where the impeachment was based upon: recent fabrication; bias, interest, corruption or other motive to falsify when the prior consistent statement was made before the existence of the motive; and prior inconsistent statements when there was an issue of whether the prior inconsistent statement was ever actually made. See Kellam. With the adoption of the Florida Evidence Code, the exceptions became the rule. See § 90.801(2)(b), Fla. Stat. (1979). Section 90.801(2)(b) provides:
A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
.....
Consistent with his testimony and is offered to rebut an express or implied charge against him of improper influence, motive, or recent fabrication. .. .
After reviewing the cross-examination and the testimony of the declarant, Martin, we find that there was an implied charge of improper influence by the police upon Martin,[2] but only in one exchange that occurred on re-cross-examination:
Q. Did the police tell you there was a Cadillac?
A. No.
Q. They didn't tell you it was a Cadillac?
A. No.
Thus, defense counsel implied to the jury that Martin's memory of the actual facts might be tainted by discussions with police that took place prior to the statement he gave to them.[3]
Although there was an implied charge of improper influence, this does not necessarily make Martin's prior consistent statement admissible. Section 90.801(2)(b), Florida Statutes (1979), only permits the admission of prior consistent statements made before the existence of the facts said to indicate the improper influence. See Preston v. State, 470 So.2d 836 (Fla. 2d DCA 1985); McElveen, 415 So.2d at 748. See also Wilson v. State, 434 So.2d 59 (Fla. 1st DCA 1983); Kellam, 287 So.2d at 734. In the present case, the fact said to indicate the influence was the discussion between Martin and the police, which occurred prior to Martin making the statement involved here. Thus, all Martin's statements, including the prior consistent statement at issue, were made subsequent to the fact said to indicate the influence. Martin's prior consistent statement, therefore, was inadmissible under the statute. Preston; McElveen.
Accordingly, we find it was error to admit Detective Parmenter's testimony which recited Martin's statement made to the detective *258 during the initial investigation where that statement was consistent with Martin's trial testimony for the state. In addition, the error in admitting this hearsay testimony cannot be considered harmless under the circumstances of the present case. As previously indicated, Martin's testimony was an important link in the state's case which tied together several elements of the circumstantial evidence against the defendant. Although it is undisputed that the bagged uniform near the murder scene belonged to the defendant, it is only Martin's testimony which indicates it was in the defendant's possession just prior to the time of the murder. This testimony permits two inferences. First, it was the defendant who left the bag near the scene of the murder; and second, the bag was left there at or near the time of the murder. There is no other testimony placing the bagged uniform in the possession of the defendant just prior to the murder.
In addition, Martin is the only witness to testify that the defendant drove back to and away from their trailer in a Cadillac on the night of the murder. This testimony is critical because it connects the defendant to the victim's car which was stolen just after the murder. The victim's neighbor testified that he heard a gunshot and that soon thereafter he heard the victim's Cadillac crank up. Although this witness testified that the Cadillac was driven in the direction of the defendant's trailer, he never identified the driver or indicated that the Cadillac stopped at the defendant's trailer. It is only Martin's testimony that puts the defendant in the Cadillac.
It was precisely these two areas of Martin's testimony that were corroborated by the detective's testimony as to Martin's prior statement. The detective's testimony had the effect of placing a cloak of credibility on Martin's testimony for the state. The proof of guilt against the defendant was not so overwhelming that the error committed can be deemed harmless.[4]See Preston.
The defendant also alleges error in the trial court's denial of his motion to suppress the victim's pocketknife which was seized from the defendant's possession incident to his arrest in New York. The facts relevant to this point are undisputed. The murder victim's body was discovered a short time after 12:30 a.m., February 25, 1985. Detective Parmenter, the lead Miami investigator on the case, arrived at the scene at approximately 2:00 a.m. The initial investigation consisted of a physical examination of the trailer in which the body was discovered and the surrounding vicinity, as well as interviews with neighbors in the area. Without detailing the evidence and information acquired again, suffice it to say that the defendant became a suspect during this initial on-the-scene police investigation and probable cause arose to arrest the defendant. Parmenter thereafter learned that the defendant had probably returned to New York where he had family. Accordingly, Parmenter subsequently had two telephone conversations with New York detectives in which he advised them that the defendant was a suspect in the homicide,[5] and requested them *259 to inform him if the defendant was located in their jurisdiction.
Although Parmenter did not state that a warrant had been issued nor specifically request that the New York authorities arrest the defendant, such was the interpretation made by the New York authorities. Officer Schreiner, one of the New York policemen involved in the defendant's arrest, testified that he was told at roll call that a warrant had been received from Florida and that the defendant was wanted in connection with a homicide. In addition, a notice to this same effect had been posted in the squadroom. Officer Elkowich, the other officer involved in the arrest, testified that he was told during roll call that the defendant was wanted by the Dade County Police Department for homicide.
After receiving a tip that the defendant was at his home, Elkowich and Schreiner proceeded to the defendant's residence. Elkowich went to the rear of the residence and Schreiner to the front. Schreiner knew the defendant prior to this incident, and recognized him as he and his brother-in-law walked out through the front door. Schreiner pulled his revolver, walked toward the defendant, and told the defendant he was under arrest. At this point, the defendant's brother-in-law stepped between the officer and the defendant, and the defendant began running up a flight of stairs toward his apartment. Upon observing the defendant make a threatening motion, Schreiner fired several shots at him and began pursuit. The defendant went through his apartment and began exiting out a back window where Elkowich, who had heard the shots, ordered the defendant to stop. After the defendant failed to heed a number of orders to halt, Elkowich fired several shots at him, and the defendant fell back into the apartment. Elkowich then entered the apartment through the rear window and found the defendant lying on a bed with a gunshot wound to his left leg. A number of items were seized in the immediate vicinity of the defendant including the pocketknife at issue here. This pocketknife was identified at trial as belonging to the murder victim.
The state's position is that the pocketknife was legally seized incident to the lawful arrest of the defendant. The issue, therefore, is whether the warrantless arrest of the defendant was proper. The circumstances here necessitate the application of the "fellow officer" rule.
The fellow officer rule, sanctioned by the Supreme Court in Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971), allows an arresting officer to rely upon the strength of a directive or bulletin on a suspect and assume probable cause exists to arrest the particular person identified in the bulletin. Thus, the arresting officer is not required to have sufficient firsthand knowledge to constitute probable cause.
It is sufficient if the police officer initiating the chain of communication either had first hand [sic] knowledge or received his information from some person, official source or eye witness, who it seems reasonable to believe is telling the truth.
Crawford v. State, 334 So.2d 141, 142 (Fla. 3d DCA 1976). See also Salas v. State, 246 So.2d 621, 622 (Fla. 3d DCA 1971) and cases cited. See generally 1 W. LaFave, Search and Seizure § 3.5(b) (1978). Cf. United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (applying the same theory in a Terry stop situation).
Under the fellow officer rule, the arresting officers in New York in the present case were entitled to assume that the officers requesting aid had sufficient information to constitute probable cause to arrest the defendant. See Whiteley, 401 U.S. at 568, 91 S.Ct. at 1037; Crawford; Salas. See also Routly v. State, 440 So.2d 1257, 1261 (Fla. 1983), cert. denied, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 888 (1984); Cummings v. State, 378 So.2d 879 (Fla. 1st DCA 1979), cert. denied, 386 So.2d 635 (Fla. 1980); Nelson v. State, 188 So.2d 353 *260 (Fla. 3d DCA 1966).[6] It is undisputed that Parmenter, the Miami detective, had probable cause to arrest the defendant when he initiated the communication with the New York authorities. Thus, the present case is distinguishable from those cases, such as Whiteley, where the officer initiating the communication had no probable cause whatsoever for arrest. In those situations, the otherwise illegal arrests cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrests.[7]See Whiteley, 401 U.S. at 568, 91 S.Ct. at 1037; Albo v. State, 477 So.2d 1071 (Fla. 3d DCA 1985); Hansen v. State, 385 So.2d 1081 (Fla. 4th DCA), review denied, 392 So.2d 1379 (Fla. 1980); State v. Harrington, 307 So.2d 466 (Fla. 2d DCA 1974). In the instant case, however, since the instigating officer did have probable cause, the warrantless arrest of the defendant by the New York police officers was valid under the fellow officer rule. It necessarily follows, therefore, that the search and seizure of the pocketknife, incident to the arrest, was lawful.
The defendant argues, however, that the fellow officer rule does not apply here because Parmenter did not specifically request the New York authorities to arrest the defendant. We reject this argument. Parmenter contacted the New York authorities on two occasions and informed them that the defendant was not only the prime suspect in the homicide involved in this case but also in a separate unrelated murder case.[8] There was no request to have the defendant arrested because at the time of the communications it was apparently not verified that the defendant was in New York. The obvious intent of the communications was that if the defendant were located, he should be arrested and detained for questioning in connection with the homicide committed in Dade County, Florida. This was precisely the manner in which the New York authorities interpreted the communications. Although we agree that there must be some chain of communication between the arresting officer and the officer who has the probable cause to arrest, we refuse to impose a hyper-technical requirement that certain "magic words" must be used before the fellow officer rule is applicable.[9]
*261 The defendant also argues that since the New York officers who arrested him proceeded on the belief that an outstanding warrant existed (which did not exist until after the arrest), the arrest and, thus, seizure, must be declared invalid under the settled law that a void or nonexistent warrant may not be the basis for a legal arrest and search. See Martin v. State, 424 So.2d 994 (Fla. 2d DCA 1983); Pesci v. State, 420 So.2d 380 (Fla. 3d DCA 1982). The defendant's argument, however, misses the mark. The state here is not relying on a nonexistent warrant but rather upon the probable cause held by Parmenter. The incorrect conclusion of the arresting officer that a warrant existed does not prevent the state from relying on the fact that probable cause did in fact exist. See Routly, 440 So.2d at 1260-61.
Accordingly, the trial court did not err in denying the motion to suppress the pocketknife seized incident to the lawful arrest of the defendant. The court did commit reversible error, however, by allowing the prior consistent statement into evidence. Therefore, the defendant's convictions are reversed and this cause is remanded for a new trial.[10]
BASKIN, J., concurs.
FERGUSON, Judge (dissenting).
The only "noncumulative" evidence furnished by Martin, a court witness, was that the defendant left in plainclothes for his job at Sambo's (where he customarily wears a uniform), with his uniform in a brown paper bag, and that the defendant returned home without the brown paper bag. The "critical" testimony focused on whether Martin was absolutely sure that what the defendant was carrying in the bag was a Sambo's uniform  like the one found in the brown bag at the homicide scene. Nowhere in the record is it disputed that the bagged uniform found at the homicide scene belonged to the defendant. I believe that in the course of a microscopic examination of a small tree we have ignored a forest of other circumstantial evidence which points to the defendant as the perpetrator to the exclusion of anyone else.
I would affirm.

On Motion for Rehearing En Banc
PER CURIAM.
This case has been considered en banc without oral argument pursuant to Fla.R.App.P. 9.331(a) because the holding of the panel majority that the admission of certain prior consistent statements of the witness Martin requires reversal creates a lack of uniformity with prior decisions of this court applying the harmless error rule. E.g., Jones v. State, 453 So.2d 1192 (Fla. 3d DCA 1984).
On the merits, we agree with the dissenting panel opinion that, considered in the light of the record as a whole, any error in this respect was, indeed, no more than harmless. State v. Murray, 443 So.2d 955 (Fla. 1984); Palmes v. State, 397 So.2d 648 (Fla. 1981), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); § 924.33, Fla. Stat. (1983).
We endorse the panel's rejection of the defendant's remaining point on appeal. The judgment under review is therefore
Affirmed.
SCHWARTZ, C.J., and BARKDULL, HENDRY, FERGUSON and JORGENSON, JJ., concur.
DANIEL PEARSON, Judge, concurring.
The admission of the witness Martin's statements to the police given on the morning after the crime was, in my view, not error at all, and, moreover, the defendant's claim of error was not preserved by appropriate objection in the trial court.
The defense insinuated in its questioning of Martin and Detective Parmenter that Martin's trial testimony as well as his *262 statements to the police were products of Parmenter's suggestions to Martin. The defense's theory as to why Martin's testimony should not be believed was that before Martin told Parmenter anything, Parmenter told Martin that a Sambo's uniform was found in a brown paper bag at the crime scene and that the victim's Cadillac was missing, thereby influencing the allegedly susceptible Martin into saying that he had seen the defendant put his Sambo's uniform into a brown paper bag and that he had seen the defendant depart in what Martin believed to be a Cadillac. It was, therefore, perfectly appropriate for the State to introduce, as it did, Martin's testimony that the police did not supply the information contained in his statement to them and Parmenter's testimony that he did not let Martin know about these details of the crime that the police had uncovered.[1] Such testimony was relevant to rebut the defense's theory that the interrogation of Martin was suggestive and was as admissible as any like testimony concerning the circumstances surrounding a lineup which the defendant claims suggestively tainted an in-court indentification. Obviously, in the very nature of this testimony, an inextricable part is what the witness told the police, since to ask whether the police told the witness a certain thing before the witness told that same thing to the police is to necessarily elicit what the witness said.
My concern is that the en banc majority's "harmless error" holding gives precedential value to Judge Nesbitt's panel opinion, which concludes that it was error to admit Martin's statements to the police as prior consistent statements under Section 90.801(2)(b), Florida Statutes (1979). The fallacy of that conclusion is that it is based on the premise that "all Martin's statements, including the prior consistent statement at issue, were made subsequent to the fact said to indicate the influence," (See page 257). This premise is quite obviously faulty because the very issue to be decided by the jury from the evidence was whether Martin's statements were made "subsequent to the fact said to indicate the influence." If they were, then it is plain that although the statements are not admissible as prior consistent statements, they do not in any way bolster the witness's trial testimony, and their admission is thus totally harmless. If, however, the jury concluded that the witness's statements were not made "subsequent to the fact said to indicate the influence," then although they most assuredly bolster the witness's trial testimony, they are nonetheless admissible.
Finally, as I have already noted, see supra note 1, there simply was never any timely objection to the introduction of Martin's statement to the police, much less a hearsay objection.
During Martin's direct testimony, he told of being awakened by the police and giving them a statement.
"Q Now do you remember what type of statement you gave them?
"A Yes, sir.
"Q Why don't you describe what type of statement you gave?
"A The same one I just gave. The same one you got on your records just about. No change in it." (emphasis supplied)
The defendant did not object to the prosecutor's questions, or move to strike the witness's answers despite the fact that here, and later, see supra note 1, the witness was testifying about his prior consistent statement. Indeed, it was not until *263 much later in the trial when Parmenter was asked what Martin told him that the first defense objection came. Not only did this objection come too late, see Allah v. State, 471 So.2d 121 (Fla. 3d DCA 1985) (where evidence has been admitted without objection, subsequent objection to admission of evidence of the same import is waived), but it was grounded on the imagined and totally meritless procedural nicety that the proper method of eliciting a prior consistent statement of the declarant is only through the testimony of the declarant himself, who must identify the statement. Since Martin's testimony about his own out-of-court declarations would be as much hearsay as Parmenter's testimony about Martin's out-of-court declarations, it is clear that no hearsay objection was being made.
Of course, in this case, it is perfectly understandable that the defendant did not object. It was the defendant himself whose strategy it was to prove that the witness's trial testimony and the witness's statement to the police, although consistent with one another, were products of police suggestions made before the statement was given and that both were therefore equally unworthy of belief. Thus, as defendant's trial counsel undoubtedly recognized, proof that Martin's trial testimony and his statement to the police were consistent did nothing to advance the prosecution's case and much for the defendant. The efforts of defendant's appellate counsel to move this court away from the reality of the trial, although creative, have already met with far more success than they deserve.
SCHWARTZ, C.J., and JORGENSON, J., concur.
HUBBART, Judge (dissenting).
I must respectfully dissent from the court's decision to rehear this cause en banc. I would deny the state's motion for rehearing en banc because, in my view, we have no en banc jurisdiction to entertain this cause under Article V, Section 4(a) of the Florida Constitution and Florida Rule of Appellate Procedure 9.331(a) [hereinafter Rule 9.331(a)]. This result seems inescapable to me based on the following briefly stated legal analysis.

I
Article V, Section 4(a) of the Florida Constitution provides that a district court of appeal "shall consist of at least three judges," and that "[t]hree judges shall consider each case and the concurrence of two shall be necessary to a decision." No specific authorization is contained in the Florida Constitution for a district court of appeal, sitting en banc, to decide a case. Nonetheless, the Florida Supreme Court has adopted a rule of appellate procedure which allows a district court of appeal to hear select cases on an en banc basis. Fla. R.App.P. 9.331(a). The constitutional theory on which the Court has based this rule is that the above-stated Florida constitutional provision "`sets only a minimum standard and does not prohibit en banc review by district courts of appeal,'" In re Rule 9.331, 374 So.2d 992, 993 (Fla. 1979) (quoting the Appellate Structure Commission's Report), modified on other grounds, 377 So.2d 700 (Fla. 1979), 416 So.2d 1127 (Fla. 1982); stated differently, the Court has "construed the `three judges shall consider each case' language of [A]rticle V, [S]ection 4[a] [of the Florida Constitution], as not restricting the district courts from hearing cases en banc." Chase Federal Savings & Loan Association v. Schreiber, 479 So.2d 90, 93 (Fla. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 2282, 90 L.Ed.2d 723 (1986). This theory, however, is at best an implied constitutional authorization for en banc hearings, and, accordingly, the ensuing en banc rule was narrowly drawn to avoid constitutional attack.
Rule 9.331(a) provides that "[a] majority of the judges of a district court of appeal participating may order a proceeding pending before the court be determined en banc," but specifically prohibits such en banc consideration except in two select types of cases: "[e]n banc hearings and rehearings shall not be ordered [1] unless the case is of exceptional importance or [2] unless necessary to maintain uniformity in the court's decisions." As to the latter ground, the Florida Supreme Court has held that a "district court of appeal ... has authority to adopt the standard of conflict it believes necessary or appropriate in order to harmonize the decisions of the court and avoid costly relitigation of similar issues within its appellate district," Chase Federal Savings & Loan Association v. Schreiber, 479 So.2d 90, 94 (Fla. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 2282, 90 L.Ed.2d 723 (1986), and is not limited "by the standards adopted in case decisions by this Court in the exercise of its discretionary conflict jurisdiction." Id. at 93. The *264 Court specifically noted that "[t]he en banc process now authorized for district courts is designed to help the district courts avoid conflict, assure harmonious decisions within the courts' geographic boundaries, and develop predictability of the law within their jurisdiction." Id. at 93.
In accord with our authority to announce conflict-type en banc standards, this court has held that en banc review is "necessary to maintain uniformity in the court's decisions", Fla.R.App.P. 9.331(a), where (1) the panel decision has announced "`a rule of law which conflicts with a rule previously announced by this [c]ourt,'" Finney v. State, 420 So.2d 639, 641 (Fla.3d DCA 1982) (en banc) (emphasis omitted), or (2) the panel decision has applied "`a rule of law to produce a different result in a case which involves substantially the same controlling facts as a prior case disposed of by this [c]ourt,'" Id., or (3) the panel decision "has misapplied a well-established rule of law in this district... ." State v. Navarro, 464 So.2d 137, 140 (Fla. 3d DCA 1985) (en banc).

II
Turning to the instant case, all agree that the case here is not of "exceptional importance," and, accordingly, the first ground for en banc review under Rule 9.331(a) is not presented herein. The court, however, announces that "the holding of the panel majority that the admission of certain prior consistent statements of the witness Martin requires reversal creates a lack of uniformity with prior decisions of this court applying the harmless error rule. E.g., Jones v. State, 453 So.2d 1192 (Fla. 3d DCA 1984)." The court, then, is relying on the second ground for en banc review under Rule 9.331(a), namely, that such review is "necessary to maintain uniformity in the court's decisions." I cannot agree with this result because, plainly, this district's announced en banc "conflict" standards have not, even arguably, been met.
First, the panel opinion, without dispute, does not announce or even intimate a rule of law which conflicts, or is out of harmony, with a rule of law announced by a previous decision of this court. Second, the panel opinion does not apply a rule of law to produce a different result in a case which involves substantially the same controlling facts as a prior case disposed of by this court. The facts of Jones v. State, 453 So.2d 1192 (Fla. 3d DCA 1984), the claimed "conflicting" decision herein, are not even remotely similar to the facts of this case. In Jones, the defendant was convicted of sexual battery, burglary and other offenses; the state introduced at trial certain "other crimes" evidence tending to show that a co-defendant had sexually assaulted the victim. We concluded that the error in admitting this evidence was entirely harmless in view of the overwhelming evidence of guilt introduced at trial, including a complete confession by the defendant. We in no way dealt with an application of the harmless error rule, as here, to a claimed erroneous admission of prior consistent statements by a state witness. Finally, given the total dissimilarity between the facts and issue presented in the instant case and the facts and issue presented in Jones, as well as the lack of any divergent rules of law announced by the court in either case, it cannot be said that the panel opinion herein has misapplied the harmless error rule in this district so as to create disharmony or instability in our precedents. As indicated previously, the entire purpose underlying the en banc rule is to avoid just such disharmony, and it is plain that the panel decision creates no disharmony or instability whatever with Jones or any other prior decision of this court. Moreover, the court makes no effort whatever to justify its assumption of en banc jurisdiction on a principled basis in this case.
Nonetheless, I recognize that the court's decision herein does not represent an aberrant assumption of en banc jurisdiction in this district. Indeed, the instant decision is one of a continuing line of decisions in which this court has assumed en banc jurisdiction in a case without regard to our established en banc standards. We have, for example, assumed en banc jurisdiction in a case solely in order to approve a three-judge panel opinion rendered in the same cause without relying on any ground for en banc review under Rule 9.331(a). Sanchez v. State, 392 So.2d 555 (Fla. 3d DCA 1981) (en banc). We have also assumed en banc jurisdiction in a case solely "in order to arrive at a resolution consistent with that in the case of Meehan v. Celotex Corp., 466 So.2d 1100 (Fla. 3d DCA 1985), which reached en banc status on motion of a party,"  obviously an invented ground for en banc review not provided for in Rule 9.331(a). Nance v. Johns-Manville Sales Corp., 466 So.2d 1113, 1115 n. 1 (Fla. 3d *265 DCA 1985) (en banc). We have further assumed en banc jurisdiction solely to reverse a majority panel opinion and adopt the dissenting opinion of one of the panel judges, without relying on any ground for en banc jurisdiction under Rule 9.331(a). State v. Guerra, 455 So.2d 1046 (Fla. 3d DCA 1984) (en banc), pet. for review denied, 461 So.2d 114 (Fla. 1985). And finally, we have assumed en banc jurisdiction to reverse a panel opinion, as here, where the asserted basis for en banc jurisdiction was nonexistent, was never explained by the court, and drew a detailed dissent on the en banc issue which was left unanswered by the court. Jones v. State, 466 So.2d 301 (Fla. 3d DCA 1985) (en banc), aff'd, 485 So.2d 1283 (Fla. 1986); Florida Power & Light Co. v. Lively, 465 So.2d 1270 (Fla. 3d DCA) (en banc), pet. for review denied, 476 So.2d 674 (Fla. 1985).
This disturbing line of decisions, of which the instant case is a graphic example, should give us good reason to pause. What is emerging in this district is, in effect, a second en banc appeals court which reviews the merits of panel decisions  affirming some, reversing others, and assuming en banc jurisdiction whenever a majority of the judges of this court think it advisable to do so, without regard to the established grounds for en banc jurisdiction under Rule 9.331(a). Plainly, there is no case-value difference between our wide-open en banc practices and the practices of an appeals court which reviews lower court decisions on the merits. Indeed, if anything, the emerging en banc appeals court in this district has been able to work in ways that no appellate court could ever work, raising, at times, grave due process concerns.[1] I think there is no constitutional warrant under Article V, Section 4(a) of the Florida Constitution for the creation of such an unauthorized en banc appeals court, and, as administered, I think the en banc rule is being applied in this district in this case, and in other past cases, in an unconstitutional manner. I therefore dissent from the court's unauthorized assumption of en banc jurisdiction in this case.
BASKIN, J., concurs.
NESBITT, Judge (dissenting):
I respectfully dissent from the court's en banc resolution of the case for three reasons.
First, Judge Pearson's concurrence improperly relinquishes to the jury a portion of the trial judge's time-honored role in determining admissibility. A prior consistent statement is admissible under section 90.801(2)(b), Florida Statutes (1979) only if made before the existence of a motive to fabricate or an improper influence. Parker v. State, 476 So.2d 134, 136 (Fla. 1985); Preston v. State, 470 So.2d 836, 837 (Fla. 2d DCA 1985); McElveen v. State, 415 So.2d 746, 748 (Fla. 1st DCA 1982).[1] *266 Therefore, when the prior consistent statement occurred is a determination which must necessarily be made before a decision on admissibility. It is the trial judge's responsibility to make that determination, not the jury's. In this case the trial court could only have concluded that the statement occurred after the alleged improper influence since Detective Parmenter recorded the statement over two hours after he began discussing the case with Martin.
Second, I disagree with Judge Pearson's waiver analysis. While it is true that the defendant allowed Martin to briefly mention his prior consistent statement, I do not believe that precluded him from objecting to the police officer's testimony about specifics of the statement. Martin had been soundly impeached. Defense counsel clearly decided that Martin's brief mention of the prior statement did not accomplish much rehabilitation. He could very well have decided otherwise with regard to the officer, a strong, objective witness who could influence the jury and who testified about critical details of the statement.[2]
Finally, I disagree with the majority's conclusion that the error was harmless. The evidence of the defendant's guilt is entirely circumstantial. That circumstantial evidence is tied together by the testimony of a court witness of limited intellectual capacity who was soundly impeached and repeatedly contradicted himself. The weakness of the state's case is highlighted by the jury's lengthy deliberations and their verdict of third-degree murder on an indictment charging first-degree murder. Application of the harmless error rule in this context requires this court's speculation as to what the jury would have done absent the bolstering of Martin's testimony by Detective Parmenter. In such a case, the error is not harmless and can only be remedied by a new trial.
Accordingly, I would deny the motion for rehearing en banc and reverse the conviction.
BASKIN, J., concurs.

ON MOTION FOR REHEARING
PER CURIAM.
Carroll's motion for rehearing correctly points out that, having affirmed his conviction, the en banc court is required to pass upon the alleged sentencing errors the panel majority opinion of reversal had found unnecessary to reach.
In reviewing these issues, we first agree that the verdict returned by the jury as to the robbery count, finding the defendant guilty of "armed robbery without a firearm," does not permit the imposition of a life sentence under section 812.13(2)(a), Florida Statutes (1983),[1] which applies only to a conviction of robbery with "a firearm or other deadly weapon." Clemon v. State, 473 So.2d 271 (Fla. 3d DCA 1985); Streeter v. State, 416 So.2d 1203 (Fla. 3d DCA 1982). The jury finding of an "armed robbery" obviously refers to the defendant's taking of the victim's pocketknife. See State v. Brown, 496 So.2d 194 (Fla. 3d DCA 1986). But since there was no finding *267 that the knife was a "deadly" weapon, only a thirty-year sentence under section 812.13(2)(b), which makes robbery an "ordinary" first degree felony if a "weapon" is carried, is permissible. See Gomez v. State, 496 So.2d 982 (Fla. 3d DCA 1986). Accordingly, after remand, the trial court shall reduce the sentence imposed as to count V of the indictment from life to a thirty-year term of imprisonment.
We also conclude that the consecutive three-year minimum mandatory terms must be made concurrent. State v. Palmer, 438 So.2d 1 (Fla. 1983).
In all other respects, the motion for rehearing is denied.
HUBBART, Judge (dissenting).
Because this court has utterly no jurisdiction to entertain this cause on an en banc basis under Fla.R.App.P. 9.331(a) based on the legal analysis contained in my prior dissenting opinion filed herein, I must dissent to the court's unauthorized pronouncements today. I adhere to may view, previously expressed, that the state's motion for rehearing en banc should have been denied by this court for lack of jurisdiction, thereby leaving the panel opinion herein intact.
NOTES
[1] The facts surrounding the defendant's arrest and the seizure of the pocketknife will be discussed in connection with the defendant's second point on appeal.
[2] It could be argued that the quoted exchange following in the text of this opinion is somewhat tenuous to support a finding of a charge of improper influence. Nevertheless, we accept the state's position in this regard without an in-depth analysis of the issue because it makes no difference in the result we reach in the present case. What would amount to an implied charge of improper influence in some future case must be left to be determined from the particular circumstances in that case.
[3] Detective Parmenter testified that on the morning after the homicide he had questioned and spoken with Martin for almost two and one-half hours before Martin's statement was taken down for the record. It is this official recorded statement that is at issue here.
[4] The dissent would indicate that this court has "ignored a forest of other circumstantial evidence which points to the defendant as the perpetrator to the exclusion of anyone else." Nevertheless, the dissent fails to point out what any of this evidence is with the exception of the defendant's bagged uniform found outside the trailer where the victim was found. The only other circumstantial evidence possibly connecting the defendant to the crime was that he left town near the time of the murder (the record indicates the defendant was somewhat of a transient, arriving in the area a few days prior to the murder) and that, when arrested in New York, the defendant was in possession of the victim's pocketknife (the defendant and victim knew each other and the pocketknife was last seen in the possession of the victim on the afternoon before the murder). Certainly, this evidence is not so overwhelming as to the defendant's guilt that the harmless error rule should be invoked.
[5] After a ballistics report matched the fatal bullet involved in the present case with one in another murder investigation, Parmenter actually informed the New York authorities on his second telephone communication that the defendant was a suspect in two separate homicides.
[6] We note that the Attorney General opinion quoted and approved in Nelson is no longer an accurate statement of the law. Under the quoted opinion, the arresting officer would have probable cause upon receiving a "pick-up notice" regardless of whether the officer issuing the notice had probable cause, thus, allowing the notice to validate an otherwise illegal arrest. This was precisely the position rejected by the Supreme Court in Whiteley, 401 U.S. at 568, 91 S.Ct. at 1037. See also D'Agostino v. State, 310 So.2d 12 (Fla. 1975). But see Shriner v. State, 386 So.2d 525, 528 (Fla. 1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 829 (1981).
[7] See supra note 6.
[8] See supra note 5.
[9] The cases cited by defendant for the proposition that a specific request to arrest must be made are unpersuasive on this point. Most of the cases relied upon are not contrary to our holding in that they involve situations where the courts found there was no channel of communication between the arresting officer and the officer having probable cause. See, e.g., State v. Cooley, 457 A.2d 352 (Del. 1983) (no communication); State v. Crowder, 1 Hawaii App. 60, 613 P.2d 909 (Ct.App. 1980) (no communication); People v. Creach, 69 Ill. App.3d 874, 25 Ill.Dec. 886, 387 N.E.2d 762 (App.Ct. 1979); (no communication or probable cause), aff'd in part, rev'd in part, 79 Ill.2d 96, 37 Ill.Dec. 338, 402 N.E.2d 228, cert. denied, 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980); Salter v. State, 163 Ind. App. 35, 321 N.E.2d 760 (Ct.App. 1975) (no communication). In addition, the other cases cited by defendant are factually distinguishable on other bases. See United States v. Woods, 544 F.2d 242, 258-62 (6th Cir.1976) (defendant was not arrested on basis of communication), cert. denied, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778, cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361, cert. denied, 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 270 (1977); People v. Ford, 150 Cal. App.3d 687, 198 Cal. Rptr. 80 (Ct.App. 1984) (no probable cause at time of communication to arresting officer); Commonwealth v. Gambit, 274 Pa.Super. 571, 418 A.2d 554 (1980) (no probable cause at time of communication to arresting officer), aff'd, 501 Pa. 453, 462 A.2d 211 (1983). None of the cases cited by the defendant specifically require that the communication contain a specific request to arrest and the defendant has not advanced any compelling reason for such a requirement; nor do the cited cases articulate any persuasive reasoning on the point. Therefore, to the extent any of these cases may be interpreted to require the requisite communication contain a specific request that an arrest be made, we decline to follow them.
[10] Since we are reversing for a new trial, we do not reach the alleged sentencing error raised by the defendant.
[1] Martin's testimony, admitted without objection, was:

"Q Rudy, do you remember the day after John [Carroll] left, the police came and talked to you?
"A Yes.
"Q You remember the police asked you a bunch of questions?
"A Yeah.
"Q It was about nine hours after this incident occurred?
"A Yeah.
"Q The police ever tell you what to say?
"A No.
"Q Did the police tell you anything about the uniform?
"A No.
"Q Did you tell the police that you saw John Carroll put the uniform in the bag?
"A Yeah.
"Q Nine hours after it happened?
"A I think so."
Detective Parmenter's testimony, also admitted without objection, was:
"Q Now, prior to taking the statement from Mr. Martin, did you provide him with any information with regard to the case that you were investigating?
"A When I originally met him early that morning, I advised him we were investigating the death of a person named Edward Ward.
"Q Did you provide him with any additional aspects of the case?
"A No."
[1] For example, this court, sitting en banc, has issued en banc opinions without giving any notice or an opportunity to be heard to the litigants that the case was being considered on an en banc basis, after the case had been fully briefed and orally argued to a three-judge panel. Nance v. Johns-Manville Sales Corp., 466 So.2d 1113 (Fla. 3d DCA 1985) (en banc); Joseph v. State, 447 So.2d 243 (Fla. 3d DCA 1983) (en banc). We have also assumed en banc jurisdiction to reverse a proposed, but unreleased panel opinion joined in by all three judges of the panel, which opinion was totally unknown to the litigants, Jones v. State, 466 So.2d 301 (Fla. 3d DCA 1985) (en banc), aff'd, 485 So.2d 1283 (Fla. 1986).
[1] A number of other jurisdictions have held likewise when the statement is offered either for rehabilitative purposes or as substantive evidence. See State v. Martin, 135 Ariz. 552, 663 P.2d 236 (1983); George v. State, 270 Ark. 335, 604 S.W.2d 940 (1980); State v. Dolphin, 178 Conn. 564, 424 A.2d 266 (1979); Crawford v. State, 139 Ga. App. 347, 228 S.E.2d 371 (1976); People v. Faysom, 131 Ill. App.3d 517, 86 Ill.Dec. 566, 475 N.E.2d 945 (1985); State v. Scott, 210 Kan. 426, 502 P.2d 753 (1972); State v. Hebert, 480 A.2d 742 (Me. 1984); Coleman v. State, 49 Md. App. 210, 431 A.2d 696 (1981); Commonwealth v. Binienda, 20 Mass. App. 756, 482 N.E.2d 874 (1985); People v. Edwards, 139 Mich. App. 711, 362 N.W.2d 775 (1985); State v. Arndt, 285 N.W.2d 478 (Minn. 1979); Smith v. State, 100 Nev. 471, 686 P.2d 247 (1984); People v. Davis, 44 N.Y.2d 269, 376 N.E.2d 901, 405 N.Y.S.2d 428 (1978); Wall v. Zeeb, 153 N.W.2d 779 (N.D. 1967); State v. Thompson, 379 N.W.2d 295 (S.D. 1985); State v. Jones, 215 Tenn. 206, 385 S.W.2d 80 (1964); McInnes v. Yamaha Motor Corp., 673 S.W.2d 185 (Tex. 1984), cert. denied, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); State v. Walker, 38 Wash. App. 841, 690 P.2d 1182 (1984); Thomas v. State, 92 Wis.2d 372, 284 N.W.2d 917 (1979). The federal courts have reached a variety of conclusions on the issue. United States v. De Coito, 764 F.2d 690 (9th Cir.1985) (prior consistent statement is admissible to rehabilitate if made before the motive to fabricate); United States v. Harris, 761 F.2d 394 (7th Cir.1985) (a prior consistent statement does not have to be made before the motive to fabricate if admitted to rehabilitate) United States v. Wilkinson, 754 F.2d 1427 (2d Cir.) (prior consistent statement only admissible if made before the improper influence or motive to fabricate), cert. denied, ___ U.S. ___, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); United States v. Feldman, 711 F.2d 758 (7th Cir.) (prior consistent statement admissible as substantive evidence if it meets the requirements of Federal Rule of Evidence 801(d)(1)(B) and is relevant under Federal Rule of Evidence 401 by being made prior to the time the alleged motive to falsify arose), cert. denied, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); United States v. Parry, 649 F.2d 292 (5th Cir.1981) (prior consistent statements are admissible as substantive evidence under Rule 801(d)(1)(B) regardless of whether they are made prior to the existence of a motive to fabricate); United States v. Quinto, 582 F.2d 224 (2d Cir.1978) (whether offered for rehabilitative purposes or as substantive evidence, a prior consistent statement is admissible only if made before the existence of a motive to fabricate or an improper influence).
[2] The sidebar discussion over admissibility revolved around section 90.801(2)(b), Florida Statutes (1979) and, therefore, the issue was sufficiently preserved for our review.
[1] Section 812.13, Florida Statutes (1983), provides in pertinent part:

(2)(a) If in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084.
(b) If in the course of committing the robbery the offender carried a weapon, then the robbery is a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.