699 So.2d 602 (1997)
Donald VOORHEES, Appellant,
v.
STATE of Florida, Appellee.
No. 83380.
Supreme Court of Florida.
June 19, 1997.
Rehearing Denied September 18, 1997.
*604 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Donald Voorhees. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the conviction but vacate his death sentence and remand for imposition of a sentence of *605 life imprisonment without possibility of parole for twenty-five years.
On January 3, 1992, Robert Sager and appellant Donald Voorhees, who was also known as James Densmore, agreed to drive Audrey Steven Bostic in Bostic's car from the Chasco Inn, a hotel where Voorhees and Sager were staying, to Bostic's residence because Bostic was drunk. On the way, Voorhees stopped the car at an automated teller machine (ATM), where Bostic withdrew $100. After stopping at a bar for some drinks, the three purchased a gallon of alcohol and arrived at Bostic's residence.
Testimony revealed that while there, all three of the men drank. Voorhees passed out on Bostic's couch, and when he awoke, Sager and Bostic were fighting, apparently over Sager's use of Bostic's telephone calling card. Voorhees got up, helped Sager tie Bostic to a chair with telephone cords, and searched the apartment for things to steal. Meanwhile, Bostic was making noise, and in an attempt to keep him quiet, Sager hit and kicked him. When that failed to keep him quiet, Voorhees and Sager kicked and tried to gag him. Again failing, the two dragged Bostic into the bedroom by his feet and continued hitting him. Because he was still making noise, Bostic was stabbed several times in the throat. As a result of the beatings and stabbings, Bostic suffered a broken hyoid bone, a severed windpipe, a broken nose, facial bruising, and several incised wounds on his arms which could have been caused by a knife. A medical examiner testified that Bostic died from a combination of blunt trauma to the head and chest, choking, binding, and incisions to the neck.
Voorhees then went into the bathroom and burned his shirt because it had blood on it. Next, he tried to wipe away any fingerprints in Bostic's house. He told Sager to turn on the oven, hoping that if it was gas-powered, it would cause the place to explode. However, the oven was electric. Sager and Voorhees left Bostic's residence in Bostic's car with Bostic's remaining cash, ATM card, and telephone calling card, and the two drove to Jacksonville.
They arrived in Jacksonville early on the morning of January 4 and went to Tony Watson's house. On the way, they stopped at several ATMs and tried unsuccessfully to withdraw money from Bostic's account. In Jacksonville, Sager told another person that he and Voorhees had beaten a guy and stolen his car. Voorhees and Sager left Jacksonville later that night and headed for Madison, Mississippi, where Voorhees had a paycheck waiting for him. During their trip, they made several long distance telephone calls using the victim's telephone calling card. After obtaining the check, Voorhees cashed it and bought camping supplies with the proceeds. In an attempt to avoid detection, they decided to get rid of Bostic's car.
On January 8, the Sheriff's Department in Wayne County, Mississippi, received several calls from residents reporting that there were two unknown men walking around in an area of the community which was inhabited mostly by older residents. At around 3:30 that afternoon, the two men went to the porch of one of the residents. This resident gave the men some coffee and notified the sheriff's department that the two men were there, were wet, and were wearing camouflage clothing. In response to the call, two sheriff's deputies went to the residence. One of the deputies testified that at the time it was cold, raining, and getting dark. The deputies asked the two men what they were doing, and the two men responded that they were camping in the nearby national forest but got lost from their camp. Following local custom, the deputies asked the two men if they would like to come to the jail to spend the night, get dry clothes while their clothes were washed, and have a hot meal. The two men agreed to go. The deputies did request that Voorhees give them a knife since it was policy to have no one in the back of the police car with a weapon. After Voorhees handed one of the deputies the knife, Voorhees and Sager went without any identification to the jail in the police car. They were not handcuffed on the ride. Once at the station, Voorhees and Sager, although not formally arrested, filled out arrest cards. They used fictitious names, addresses, and social security numbers. While the two slept in the jail for the night in the same cell, Mississippi *606 officers ran a check on the names given, and the search revealed nothing.
At around 7 a.m. the next morning, Voorhees was told he could not leave the jail until he provided the officers with a true identification. By 12:30 that afternoon, Sager had told Mississippi officers his real name, which checked out. Voorhees said that he could prove who he was by calling a friend in Jacksonville, Florida. He telephoned Tony Watson and stated that he was James Densmore, was in Mississippi, and wanted Watson to verify Voorhees' identity as Densmore to the officer so that he could be released. The officer then spoke to Watson, who identified the man in the station in Mississippi as Donald Voorhees. Moreover, Watson told the Mississippi officer that a police officer from Pasco County, Florida, was looking for Voorhees and Sager in an attempt to ask them about a murder in Pasco County. Watson gave the Mississippi officer a telephone number for the Pasco County officer.
Immediately thereafter, the Mississippi officer asked Voorhees if his name was Voorhees. Voorhees said "yes" and gave that officer another date of birth and social security number. The Mississippi officer then told Voorhees that officers from the Pasco County Sheriff's Department wanted to talk to him and Sager about a murder. The Mississippi officer told Voorhees and Sager that they could not leave until he found out what the Pasco County officers wanted. He then placed Voorhees and Sager in separate cells.
Next, the Mississippi officer went back to his desk and called the Pasco County Sheriff's Department. An officer in that department confirmed that Pasco County officers were looking to talk to Voorhees and Sager about a murder and that these officers would go to Mississippi to talk to Voorhees and Sager later that same day. After relating this information to Voorhees, the Mississippi officer allowed Voorhees to tell Sager about the Pasco County officers coming to talk to them about a murder. The officer overheard Voorhees tell Sager: "Everything will be alright. I'll take care of this." This occurred between 2 and 2:30 p.m.
Later that day, Voorhees had a conversation with a fellow inmate. In that conversation, he told the inmate that he had cut a guy's throat after being "pretty drunk." Pasco County officers arrived in Mississippi around midnight the same night. They read Voorhees his Miranda rights, and Voorhees confessed to his participation in the murder, stating that he tied up the victim with telephone cord, searched the victim's apartment for things to steal, and stuck a knife in the victim's throat.
An arrest warrant was obtained on January 10 after Pasco County officers interviewed Voorhees and Sager. Voorhees waived extradition and was returned to Florida on January 10. After a jury trial, he was convicted of first-degree murder. Thereafter, a sentencing proceeding was held, and the jury recommended death by vote of nine to three. Finding two aggravators,[1] three statutory mitigators,[2] and other nonstatutory mitigation,[3] the trial court followed the jury's recommendation and sentenced Voorhees to death.
On appeal to this Court, Voorhees raises fifteen issues, six relating to his conviction and the remaining relating to his sentence. In his first issue, Voorhees contends that the trial court erred in denying his motion to suppress evidence obtained as a result of his detention in Mississippi. This evidence includes the knife that was taken from Voorhees before he entered the police car, any statements made during the ride to jail, and confessions made to jailhouse trustee Benny *607 Humphrey and to Pasco County officers when they arrived in Mississippi. For purposes of our analysis, we will break down his argument into two components. The first is whether the trial court abused its discretion in determining that Voorhees' encounter with and subsequent detention by Mississippi officers was initially legal, became unlawful, and thereafter the detention became again legal. The second component is a determination of whether the trial court abused its discretion in finding the evidence obtained as a result of the detention should not be suppressed. The sum of our analysis is that we do not find the trial court's finding the evidence to be admissible should be reversed.
Beginning with the first part, Voorhees contends that his initial encounter with police was illegal. Therefore, he claims that the knife which Voorhees gave to Mississippi officers when he entered the officers' car and the statements made while Sager and Voorhees were in the car should have been suppressed. The trial court found that the initial encounter with Mississippi officers was consensual and there was thus no illegal seizure warranting suppression of this evidence. The trial court stated in its order:
After making one fruitless attempt, Deputy Walker found the defendants at approximately 4:30 p.m. on January 8, 1992. In addition to the fact that it had been raining, Deputy Walker testified that it gets dark at approximately 5:00 p.m. at that time of year, and it was turning much colder. Defendant Sager identified himself as Mr. Scott and defendant Voorhees identified himself as Mr. O'Donnell. Basically the defendants stated that they had been camping in the nearby DeSoto National Forest, that their car had been thoroughly bogged down and that they had somehow wandered away from their campsite and become lost. Although Deputy Walker was somewhat dubious about the defendants' story, he followed what appears to be a long standing procedure in Wayne County, Mississippi. He offered to put the defendants up for the evening at the county jail, wash and dry their clothes, give them a hot meal and give them some dry clothes to wear. Deputy Walker was of the opinion that the defendants were broke and, indeed, a subsequent inventory of their belongings revealed that they had a total of $5.01 between them. It was for this reason that Deputy Walker did not offer to take them to one of the county's four motels, however he made it plain that he would have done so if they had asked. At this point there is no objective evidence that the defendants were not free to leave and the Court finds that a reasonable individual would have understood that he was free to leave and was simply receiving an offer. The Court further finds that the offer extended by Deputy Walker and authorized by long standing policy not only has some beneficial effects for individuals in Wayne County, Mississippi who have suffered some misfortune, but also has the benefit of not requiring Deputy Sheriffs to run all over the county answering calls about "strangers" in the community. Unfortunately, the defendants were not told that this policy also requires the defendants provide truthful information about their names and that they will not be released from the county's "hospitality" until their true names can be determined. In any event, the defendants voluntarily agreed to spend the night in the jail and were transported to the jail in the rear seat of Deputy Walker's marked police cruiser. The defendants were not handcuffed or restrained in any way and, although Deputy Walker could not recall whether or not he locked the back door to the cruiser, he indicates that he would have stopped at any time and allowed them to leave the cruiser if they had asked. Neither asked. The only precaution Deputy Walker took was to remove a white handled kitchen knife which was observed in Mr. Voorhees' (O'Donnell) breast pocket. Upon arrival at the jail, Deputy Walker filled out an arrest card as a means of accounting for the defendants' presence in the jail, however, the individuals were not finger printed or photographed. During the ride to the jail, Sager (Scott) indicated, without any questioning on the part of Deputy Walker, that the car that they had gotten stuck was a maroon Pontiac that belonged to his (Sager's) girlfriend. At *608 the jail, the defendants were, as promised, fed and given dry clothing and placed in a holding cell which was separated by a short distance from the main jail.
The United States Supreme Court has defined a consensual encounter as one in which a reasonable person would feel free to disregard the police and go about the person's business. Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); see also Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) (finding that police officers do not violate the Fourth Amendment prohibition against unreasonable searches and seizures by approaching an individual on the street and asking if the person is willing to answer a few questions; if so, putting questions to the person and offering the person's voluntary answers to such questions in evidence in a criminal prosecution). A consensual encounter does not require the police to have a reasonable suspicion of any improper conduct before initiating conversation. Popple v. State, 626 So.2d 185 (Fla.1993). A court, when determining whether a particular encounter is consensual, must look to all the circumstances surrounding the encounter when deciding if the police conduct would have communicated to a reasonable person that the person was free to leave or to terminate the encounter. Bostick, 501 U.S. at 439, 111 S.Ct. at 2389.
Under this standard, we find the trial court did not abuse its discretion in finding that Voorhees' initial encounter with the Mississippi officers was consensual. When Voorhees was approached by the officers in Mississippi, it was raining, cold, and almost dark. Voorhees stated that he was lost. The Mississippi officers offered Voorhees shelter for the night, clean clothing, and a hot meal. The record does not reflect any action on the part of the officers that would make a reasonable person feel that the person was not free to leave or terminate the encounter. Before Voorhees voluntarily entered the officers' car, Voorhees handed one of the officers a knife. We find no basis upon which to disturb the trial court's determination that the knife was given to the officer as part of the consensual encounter to facilitate Voorhees' taking advantage of the offer of food and lodging. Thus, we conclude that the trial court did not err in denying the motion to suppress the knife.[4]
The result is the same concerning any statements made by Voorhees or Sager during the ride to the jail in the officers' car because the nature of the encounter did not change during the ride.[5] One of the officers testified at the hearing on the motion to suppress that the two were not handcuffed, the doors to the car were not locked, and the officer would have taken the two to a motel. However, the officer did not make the offer because he thought the two did not have any money, and in fact they only had $5.01 between them. Since a reasonable person in these circumstances would have felt free to leave, we find no abuse of discretion in the trial court's finding that this was not an unconstitutional seizure requiring any statements made during the ride to be suppressed.
Next, Voorhees points out that the trial court found that the nature of the encounter changed at 7 a.m. on January 9, when Mississippi officers told Voorhees that he would not be released until he gave them a valid identification. The State does not contest this finding. The trial court then found that at around 2 to 2:30 p.m., the detention again became legal under the "fellow officer rule" when Mississippi officers spoke to Pasco officers. In its order denying defendant's motion to suppress, the trial court wrote:
4. Unfortunately for the defendants, the character of their detention again changed at approximately mid-afternoon on January 9, 1992 when Deputy Walker of the Wayne County Sheriff's Office spoke *609 on the phone with Detective Spears of the Pasco County Sheriff's Office and learned that the Pasco officers wanted to speak with the defendants concerning a murder in Pasco County, Florida. Prior to this point in time, it is acknowledged that the defendants existed in a type of legal "limbo" in which they had no access to counsel or the judiciary and, not having been formally arrested, had no ability to post bond. It is, however, also apparent that the purposes or motive[s] for the detention by the Wayne County authorities were completely unrelated to the Pasco County charges since they were not aware of the Pasco County charges prior to mid-afternoon on January 9, 1992. A number of cases indicate that the purpose [or] motivation for such detention is a significant factor. Brown v. Illinois, 422 U.S. 590, 604-05, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); Dunaway v. New York, 442 U.S. 200, 215-16, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979); Hayes v. Florida, 470 U.S. 811, 816-17, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985); State v. Stevens, 574 So.2d 197 (Fla. 1st DCA 1991).
5. As of mid-afternoon on January 9, 1992, the authorities in Wayne County, Mississippi stood in virtually the same position as the authorities in Pasco County, Florida based upon the "fellow officer" rule. Carroll v. State, 497 So.2d 253 (Fla. 3rd DCA 1985). Although it is clear that the standing of the officers in Wayne County, Mississippi rises or falls with the standing of the officers in Pasco County, this Court has determined that Pasco County Detective William Lawless had sufficient information to constitute probable cause to arrest the defendants for murder prior to the time that any contact was made between Pasco County authorities and Wayne County authorities. The fact that Pasco County authorities did not specifically request the Wayne County authorities to make an arrest or take any action is not significant. Carroll v. State, 497 So.2d 253, 260 (Fla. 3rd DCA 1985).
The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers. See Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); People v. Ramirez-Portoreal, 88 N.Y.2d 99, 643 N.Y.S.2d 502, 510-11, 666 N.E.2d 207, 215 (1996) (finding the fellow officer rule provides that even if an arresting officer lacks personal knowledge sufficient to establish probable cause, the arrest will be lawful if the officer acts upon the direction of or as a result of communication with a superior or fellow officer or another police department provided that the police as a whole were in possession of information sufficient to constitute probable cause); cf. Unites States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (applying the fellow officer rule in holding reasonable a Terry stop made upon reasonable reliance upon a flier issued by another police department which had reasonable suspicion). In Johnson v. State, 660 So.2d 648 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996), we found this rule applicable in Florida. Specifically, we stated:
The issue here is whether an officer who himself lacks any personal knowledge to establish probable cause, who has not been directed to effect an arrest, and who does not know a valid warrant has been issued nevertheless can lawfully arrest a suspect. In broad terms, the collective knowledge of police investigating a crime is imputed to each member under a rule of law often called the "fellow officer rule" or "collective knowledge doctrine." The exact contours of the rule are not entirely clear. Florida courts have tended to frame this doctrine in very sweeping terms, e.g., Carroll v. State, 497 So.2d 253 (Fla. 3d DCA 1985), review denied, 511 So.2d 297 (Fla. 1987), though we obviously are bound by any contrary federal law in the Fourth Amendment context.
Johnson, 660 So.2d at 657 (footnote omitted).
By the afternoon of January 9, through its own independent investigation, Pasco County officers knew that Voorhees and Sager were the last people seen with the victim. The victim was found in his home with the doors properly locked and no sign of forced entry. Pasco County officers also *610 knew from interviewing people in Jacksonville that Voorhees and Sager were traveling in a car fitting a description of the victim's and that Sager told a friend that he and Voorhees beat the car's owner and stole his car. Sager's description was consistent with the victim's condition when the police found him. Based upon these facts known to Pasco County officers, they had probable cause to arrest Voorhees. In turn, this probable cause provided a lawful basis for Voorhees' arrest in Mississippi and made Voorhees' detention proper following the interaction between Pasco County officers and Mississippi officers. Therefore, we agree with the trial court's conclusion that Voorhees' detention was legal beginning at the time that the Mississippi officers became aware that Voorhees and Sager were wanted for a murder in Pasco County. See generally United States v. Butler, 74 F.3d 916, 921 (9th Cir. 1996) (finding that probable cause can be demonstrated through the collective knowledge of police officers involved in an investigation even if some of the information known to other officers is not communicated to the arresting officer).
Accepting that beginning at 7 a.m. until mid-afternoon that day the detention was illegal, we next address the second component of Voorhees' argument: the appropriate remedy for this constitutional violation. Voorhees argued to the trial court and to this Court that as a result of this illegal detention, any statements he made following this detention, even though these statements were made after the detention became lawful, should be suppressed. These statements include his confession to a jailhouse trustee, Benny Humphrey, and his confession to Pasco County officers when they questioned him later that night. Since Voorhees' illegal detention was an unreasonable seizure under the Fourth Amendment to the United States Constitution and article I, section 12 of the Florida Constitution, we will first address the legal effect of this constitutional violation.[6] Also, since Voorhees seeks suppression of statements made during his detention, we will address concerns relating to both the Fifth Amendment and article I, section 9 of the Florida Constitution.[7]
Turning first to the Fourth Amendment violation, suppression of evidence obtained in violation of this amendment is a judicial remedy imposed to promote two purposes: (1) deterring police misconduct; and (2) maintaining the integrity of the judicial system. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In Wong Sun, the United States Supreme Court set forth the following test to be used when examining whether a Fourth Amendment violation compels the suppression of seized evidence:
We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
Id. at 487-88, 83 S.Ct. at 417 (quoting John MacArthur Maguire, Evidence of Guilt 221 (1959)); see also Delap v. State, 440 So.2d 1242 (Fla.1983), cert. denied, 467 U.S. 1264, 104 S.Ct. 3559, 82 L.Ed.2d 860 (1984).
In other words, a Fourth Amendment violation is not synonymous with the application of the exclusionary rule. See Arizona v. Evans, 514 U.S. 1, 12, 115 S.Ct. 1185, 1192, 131 L.Ed.2d 34 (1995). As the Court there stated: "[T]he issue of exclusion is separate from whether the Fourth Amendment has been violated, and exclusion is appropriate only if the remedial objectives of the rule are thought most efficaciously served." Id. at 13-14, 115 S.Ct. at 1192-93 (citations omitted).
*611 Several years after Wong Sun, the Supreme Court clarified the analysis to be undertaken when determining whether evidence obtained following an illegal detention must be suppressed. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). These factors include whether Miranda warnings were given, the temporal proximity of the arrest and confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of officer misconduct. Id. at 603-04, 95 S.Ct. at 2261-62. The voluntariness of the statement is a threshold requirement, and the burden of showing admissibility is on the state. Id.; see also Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Sanchez-Velasco v. State, 570 So.2d 908 (Fla. 1990), cert. denied, 500 U.S. 929, 111 S.Ct. 2045, 114 L.Ed.2d 129 (1991).
Additionally, because this evidence may be considered testimonial, the Fifth Amendment implications must be analyzed. See State v. Stevens, 574 So.2d 197 (Fla. 1st DCA 1991). Mississippi police did not give Voorhees any Miranda warnings, and he did not receive any until just prior to his interrogation by Pasco County officers. However, neither article I, section 9, nor the Fifth Amendment independently proscribes the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make an incriminating testimonial communication. See Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); accord Traylor v. State, 596 So.2d 957 (Fla.1992) (finding guidelines for interrogation under article I, section 9, Florida Constitution, do not apply to voluntary statements initiated by the suspect or statements obtained in noncustodial settings or through means other than interrogation).
Also, the United States Supreme Court has held Miranda concerns are not implicated when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. See Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (finding admissible statements made by an inmate to a jailhouse informant without Miranda warnings, reasoning that Miranda was not meant to protect suspects from boasting about criminal activities in front of persons whom they believe are their cellmates). The State has the burden to show by a preponderance of the evidence that the confession was voluntary, and voluntariness is determined by looking at the totality of the circumstances. See generally Traylor; Roman v. State, 475 So.2d 1228, 1232 (Fla.1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986).
We conclude that the trial court correctly effected constitutional analyses under both our state and federal constitutions which correctly applied the principles of the foregoing decisions. In the order denying defendant's motion to suppress, the trial court made the following findings concerning these confessions:
6. It is also important to keep in mind that the exclusionary rule's theory of deterrence operates "only if an excludable piece of evidence is the target of police activity." Collins v. Beto, 348 F.2d 823 (5th Cir.1965). In the instant cases, the purposes of the admittedly illegal detention by the Wayne County officials from approximately 7:00 a.m. on January 9, 1992 to approximately mid-afternoon on that same date was to obtain the defendants' true names, not to further the investigative efforts of Florida authorities. The decision of the Illinois Supreme Court in People v. Gabbard, 78 Ill.2d 88, 34 Ill.Dec. 751, 398 N.E.2d 574 (Ill.1979), as explained in People v. White, 117 Ill.2d 194, 111 Ill.Dec. 288, 512 N.E.2d 677 (Ill.1987), "held that a confession to a crime other than the one for which the defendant had been illegally arrested need not be suppressed as the fruit of an unlawful arrest. The arresting and interrogating officers belonged to different police forces. Neither the arresting officer nor the governmental entity by which he was employed was investigating, or responsible for investigating, the crime to which the defendant confessed. This Court held that suppression of the confession would not serve the deterrent purpose of the exclusionary rule" (emphasis supplied). Further, the White Court provided the following logical observation:

*612 Very few officers would illegally arrest a suspect on the off chance that the officer for another police force, investigating a different crime, might later interrogate the suspect and obtain a confession. It is much more likely, however, that an officer would illegally arrest a suspect in the hope that an interrogating officer of the same force, investigating the same crime and conveniently left unaware of the illegality, might obtain the suspect's confession.
The logic of the Supreme Court of Illinois is compelling. It is apparent that the Mississippi authorities were not acting for purposes of furthering Pasco County's murder investigation. If that had been the case, the Mississippi authorities would either have initiated or attempted to initiate interrogations with the defendants. In fact, the Mississippi authorities only spoke to defendant Sager about the murder when Sager initiated the communication. There is no indication that the Mississippi authorities made any effort to initiate conversation concerning the Pasco County charges with either defendant after the Mississippi authorities became aware of the Pasco investigation. This reasoning applies equally to statements communicated to trustee Benny Humphrey by defendant Voorhees. Once again, there is no question that Voorhees initiated the communication with Humphrey. Although it is readily acknowledged that Humphrey occupies a highly unusual position in the Wayne County Jail, the record is devoid of evidence that Humphrey was instructed to "cultivate" Voorhees or Sager for information regarding the Pasco County investigation. There is, likewise, no evidence that Humphrey received any reward as a result of his actions or that he expected to receive any such reward.
7. As to the statements made by defendants to Pasco County authorities while the defendants were incarcerated in the Wayne County jail, it is apparent to the Court that said statements constituted an act of free will on the part of the defendants and that there were sufficient intervening factors to dissipate and purge any taint associated with the earlier illegal detention by the Wayne County authorities. State v. Gifford, 558 So.2d 444 (Fla. 4th DCA 1990) has held that a four (4) hour span between the illegal detention and the defendant's statements and the elements that supported the investigating detective's probable cause constituted sufficient intervening factors. In this case, a span of time considerably longer than four (4) hours was involved. The fact that both defendants became aware of the Pasco murder investigation at approximately mid-afternoon on January 9, 1992 also appears to be a significant intervening factor between illegal detention and the incriminating statements. The same can be said concerning the fact that the defendants were independently advised of their rights by the Pasco officers. Of course, as noted in the Gabbard case, it is significant that the officers who initiated the illegal detention for reasons completely unconnected with the Pasco County murder investigation, were from an agency other than the Pasco County Sheriff's Office and were from an entirely different state. It is also significant to note that Sager's initial statement to Wayne County authorities and Voorhees' initial statement to a Wayne County jail inmate were both initiated by the defendants themselves and can also be considered as significant intervening factors which ought to purge any taint arising from the period of illegal detention in the Wayne County jail.
Based upon our review of the record and of the decisions set forth in this opinion and in the trial court's order, we affirm the trial court's ruling that these statements should not be excluded under either the state or the federal constitution[8] and, accordingly, affirm the trial court's well-reasoned order.
*613 In issue 2, Voorhees contends that he was absent from several critical stages of the trial, including being physically absent from the site where juror challenges were made. Specifically, Voorhees relies on Coney v. State, 653 So.2d 1009 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 315, 133 L.Ed.2d 218 (1995). However, this claim must fail because our ruling in Coney, which was issued one year after Voorhees' trial was held, has only prospective application and does not apply to cases which were tried before Coney was issued. Boyett v. State, 688 So.2d 308 (Fla.1996). Consequently, this claim is meritless. As well we reject Voorhees' other claims of error within this issue because our review of the record shows that during any of the asserted times, Voorhees' presence could not have aided counsel on any matters argued. Roberts v. State, 510 So.2d 885 (Fla.1987), cert. denied, 485 U.S. 943, 108 S.Ct. 1123, 99 L.Ed.2d 284 (1988).
In issue 4, Voorhees claims that the trial court erred in preventing him from introducing testimony from several witnesses, including officers from Mississippi and Pasco County, in the guilt phase of the trial which would have shown that his codefendant Sager admitted to cutting the victim's throat.[9] He claims this testimony would have allowed the jury to conclude that Voorhees was not sufficiently involved in the crime to warrant a jury verdict of first-degree murder and was admissible under section 90.804(2)(c), Florida Statutes (1991), which states:
HEARSAY EXCEPTIONS.The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
....
(c) Statements against interest.A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject him to liability or to render invalid a claim by him against another, so that a person in the declarant's position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
The trial court found that the statements were inadmissible in the guilt phase of the trial[10] because the statements did not exonerate Voorhees.[11] We agree with Voorhees that it was error for the trial court not to admit Sager's separate statements to both Mississippi and Pasco County officers while Sager was in jail in Mississippi; the statements were admissible on the basis of section 90.804(2)(c). The trial court was incorrect in determining that the statements had to "exonerate" Voorhees. The test of admissibility under this section, after showing the declarant's unavailability, is whether the statements were relevant, tended to exculpate Voorhees, and met the test of corroboration. We conclude that the proffered statements met these admissibility requirements, and the weight to be given the statements should have been for the jury to determine.
We find this error harmless as to the guilt phase, however, because we determine that both the other properly introduced evidence and the instructions given to the jury supported Voorhees being found guilty of first-degree murder under a felony-murder theory. See § 782.04, Fla. Stat. (1991). Voorhees admitted in his confession that while the victim was tied up, Voorhees and Sager searched through the victim's house looking for things to steal and that they had taken the victim's remaining cash from his pockets. This was consistent with the evidence *614 adduced at trial which showed that the victim's house was ransacked and that the pockets of the victim's pants were turned inside out and were empty. Sager's statements did not contradict the evidence that Voorhees actively participated in the crime but rather tended to support it. Sager stated that Voorhees gave Sager the phone cords to tie up the victim and was looking around the apartment for things to steal. Additionally, after the victim's throat was slit, the evidence showed that Voorhees and Sager took the victim's car, ATM card, and telephone calling card; that they drove to several ATMs, where they attempted to withdraw money from the victim's bank account; and that they used the victim's calling card. Consequently, we find the error to be harmless beyond a reasonable doubt. See Brown v. State, 644 So.2d 52 (Fla.1994), cert. denied, 514 U.S. 1117, 115 S.Ct. 1978, 131 L.Ed.2d 866 (1995).[12]
Likewise, we find no merit to Voorhees' issue 6, whether the trial court erred in denying a motion for mistrial after the prosecutor made what Voorhees asserts were highly inflammatory remarks during closing argument to the jury during the guilt phase of the trial. Voorhees contends that the prosecutor exceeded the bounds of proper argument by stating that Voorhees and Sager tortured the victim by slicing his arm in order to obtain his ATM code because this argument cannot be reasonably inferred from the evidence. However, based upon our review of the prosecutor's entire bifurcated argument, we do not agree that a mistrial was warranted.[13] In order to require a new trial, the prosecutor's comments must
either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.
Spencer v. State, 645 So.2d 377, 383 (Fla. 1994). In light of the evidence, we do not find that the trial court erred in denying the motion for mistrial based upon the prosecutor's comments because these comments fail to meet any of the aforementioned requirements.
Additionally, while Voorhees does not directly challenge the sufficiency of the evidence, we find the record contains competent, substantial evidence to support Voorhees' conviction for first-degree murder.
Turning to the penalty phase, we find dispositive Voorhees' issue 15: whether the death penalty is proportionate. Our proportionality review is not a comparison between the number of aggravating and mitigating circumstances. See Terry v. State, 668 So.2d 954, 965 (Fla.1996). Rather, it requires this Court to consider the totality of the circumstances in a case and to compare the case with other capital cases. Id. By ensuring that death not be imposed as a punishment for a murder in cases similar to those in which death was deemed an improper punishment, proportionality prevents the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Kramer v. State, 619 So.2d 274, 277 (Fla.1993). The totality of the circumstances in this case do not place this murder among the most aggravated and least mitigated for which the death penalty is reserved. Id.
In Kramer, after drinking beer with the victim, the defendant and the victim began arguing. When the victim pulled a knife on the defendant, the defendant threw a rock at the victim, hitting the victim in the head. The defendant then hit the victim again in the head with the rock, killing him. In aggravation, the trial court found two aggravators: prior violent felony conviction; and the *615 murder was heinous, atrocious, or cruel. Id. at 277-78. Nevertheless, we found that the evidence taken in the worst light showed that this was a spontaneous fight, occurring for no apparent reason between the defendant, a disturbed alcoholic, and the victim, who was legally drunk. Id. at 278. Based on this finding and the mitigation presented, which included alcoholism, mental stress, severe loss of emotional control, and potential for productive functioning in the structured environment of prison, we found death not to be a proportionate penalty. Id.
As in Kramer, we find the evidence here does not support the imposition of the death penalty. The two aggravators in this case are overshadowed by the mitigation and circumstances of this murder: the murder occurred after a drunken episode between the victim and the defendant. There was direct evidence that Voorhees, Sager, and the victim were all intoxicated during the murder. This evidence came in through Voorhees' confession and statements made by Sager in which he acknowledged that the three were drinking. This is also corroborated by the victim's blood alcohol level of .24 percent. As well, there was expert testimony that Voorhees began drinking at an early age, suffered from alcoholism, and had an abnormal reaction to alcohol. Cf. Nibert v. State, 574 So.2d 1059, 1063 (Fla.1990) (finding that defendant suffered from extreme alcohol abuse and had been drinking during commission of crime was relevant and supportive of mitigating circumstances of extreme mental or emotional disturbance and substantial impairment of defendant's capacity to control his behavior). The totality of the circumstances and the mitigation presented here require us to conclude that death is not a proportionate penalty in this case.
Accordingly, we affirm the conviction, vacate the death sentence, and remand for imposition of a sentence of life imprisonment without possibility of parole for twenty-five years.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW and HARDING, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which GRIMES, J., concurs.
ANSTEAD, J., concurs in result only.
WELLS, Justice, concurring in part and dissenting in part.
I concur with the majority that the first-degree murder conviction should be affirmed. However, I dissent from the reversal of the death sentence in this case. While in his own home, the victim was beaten, hog-tied, and had his throat slit, causing him to suffer injuries including a broken hyoid bone, a severed windpipe, and a broken nose. Following the murder, Voorhees burned his shirt because it had blood on it and wiped the house down to eliminate any fingerprints. Voorhees also told Sager to turn on the oven to cause the place to explode and drove himself and Sager to Jacksonville in the victim's car. The trial court found two aggravating circumstances applied to this murder committed during the course of a robbery.
On these facts, I cannot agree that this case is controlled by Kramer v. State, 619 So.2d 274 (Fla.1993). Rather, this case is more similar to Whitton v. State, 649 So.2d 861 (Fla.1994), cert. denied, ___ U.S. ___, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995), in which the defendant, several hours after beating, stabbing to death, and robbing the intoxicated victim, obtained a car wash. Although there was more found in aggravation in Whitton, that case should control. Consequently, I would not remand this case for imposition of life imprisonment without the possibility of parole for twenty-five years.
However, because the trial court improperly employed a standard of "reasonable certainty" in evaluating the mitigating circumstances, I would remand this case for resentencing before the trial court.
GRIMES, J., concurs.
NOTES
[1] The court found and weighed the following aggravators: the crime was committed while Voorhees was engaged in a robbery, great weight; and the crime was heinous, atrocious, or cruel, great weight.
[2] The court found and weighed the following statutory mitigators: Voorhees was under an extreme mental or emotional disturbance at the time of the offense, minor weight; Voorhees was twenty-four years old at the time of the crime, very little weight; and Voorhees was an accomplice whose participation in the crime was relatively minor, very little weight.
[3] The court found and weighed nonstatutory mitigation that Voorhees was emotionally, physically, and sexually abused as a child, not substantial weight.
[4] Additionally, we find no merit in Voorhees' issue 3, that the trial court erred in admitting the knife into evidence, because we find it relevant as there was some testimony linking the knife to the murder scene as well as linking the knife to the stolen car.
[5] The trial court found that during the ride, Sager voluntarily told the officers that he and Voorhees had been driving Sager's girlfriend's maroon Pontiac, which got stuck in the mud.
[6] In accordance with article I, section 12, we construe this section in conformity with United States Supreme Court decisions interpreting the Fourth Amendment.
[7] We recognize that any alleged incriminating statements must first pass muster under our state constitution before we analyze them under the federal constitution. See Allred v. State, 622 So.2d 984 (Fla.1993). In this case, we find these statements admissible under both constitutions.
[8] Additionally, we note that we find no error concerning the questioning of Voorhees as to his name. See Allred v. State, 622 So.2d 984, 987 (Fla.1993) (finding that routine booking questions such as asking one's name do not require Miranda warnings because they are not designed to lead to an incriminating response but rather are designed to obtain essential biographical data).
[9] This testimony included a confession given to Mississippi officers while Sager was in the Mississippi jail, a confession given to Pasco County officers while Sager was in the Mississippi jail, and statements made to two fellow inmates while Sager was incarcerated in prison in Florida.
[10] The judge did admit these statements in the penalty phase of the trial.
[11] With respect to the statements made to fellow inmates in Florida, the trial court also found that the statements did not have sufficient corroborating circumstances. We find that the trial court did not abuse its discretion in finding these statements inadmissible.
[12] Our disposition of this issue, finding the evidence sufficient to support a conviction of first-degree murder under a felony-murder theory, also disposes of Voorhees' issue 5: whether the trial court erred in denying Voorhees' judgment of acquittal because the evidence was insufficient to prove premeditated murder.
[13] This review also leads us to conclude that there is no merit to any other claim of prosecutorial misconduct in the closing argument which would require a mistrial.