# Supreme Court of Florida

_____

No. SC14-1672
_____

**LUIS A. MONTES-VALETON,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[February 23, 2017]

CANADY, J.

Luis A. Montes-Valeton seeks review of the decision of the Third District Court of Appeal in Montes-Valeton v. State, 141 So. 3d 204 (Fla. 3d DCA 2014), on the ground that it expressly and directly conflicts with a decision of this Court, Voorhees v. State, 699 So. 2d 602 (Fla. 1997), on a question of law. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. The case turns on whether a blood draw after a traffic accident was constitutionally permissible under the fellow officer rule. We conclude that the Third District impermissibly relied on the fellow officer rule when there had been no communication concerning the suspect from the officer possessing probable cause to the officer effecting the search. We

also reject the Third District's alternative conclusion that voluntary consent supported the blood draw. We therefore quash the decision of the Third District.

## I. BACKGROUND

On June 7, 2008, Montes-Valeton was involved in a single-vehicle car crash in which a single fatality occurred. After the State filed a three-count information charging Montes-Valeton with DUI Manslaughter, DUI Damage to Property or Person, and Careless Driving, Montes-Valeton filed a motion to suppress the results of an analysis of blood drawn from him following the car crash. On March 19, 2012, the trial court held a hearing on the motion to suppress.

Sergeant Luis Alexander Tejera, the first law enforcement officer to respond to the scene of the crash, testified at the hearing that he observed Montes-Valeton's vehicle rolled over on its side and surrounded by a number of people on Interstate 95. Upon speaking to Montes-Valeton, Sergeant Tejera noticed that he was worried, disoriented, confused, and that he emitted an odor of alcohol about his breath. Sergeant Tejera became concerned that Montes-Valeton may have been under the influence of alcohol. Soon thereafter, Sergeant Tejera delegated the role of lead traffic crash investigator to Trooper Victor Molina and thereby engaged in general communications with Trooper Molina. There is no indication in the record that Sergeant Tejera communicated his concerns about Montes-Valeton's possible intoxication to Trooper Molina or to any other law enforcement officer.

Trooper Molina testified at the hearing that he performed routine investigative functions at the scene of the crash including speaking to witnesses and examining physical evidence such as tire marks and skid marks. During the course of his investigation, Trooper Molina approached Montes-Valeton to question him about the car crash. After this initial encounter, Trooper Molina asked if Montes-Valeton would consent to a blood draw. Trooper Molina then read the implied consent warnings that came with the blood draw kit to Montes-Valeton. Thereafter, Montes-Valeton agreed to the blood draw by signing a written consent form provided by Trooper Molina that stated, "I have granted permission for blood samples to be taken." Trooper Molina oversaw the blood draw performed by fire rescue and determined that Montes-Valeton was at fault for the traffic crash.

At the hearing, Montes-Valeton argued that the trial court should grant the motion to suppress because Trooper Molina lacked probable cause to extract blood from him under section 316.1933, Florida Statutes (2008). The State countered that the blood evidence should not be suppressed because it was a consensual blood draw. The State further asserted that probable cause existed for the officers to believe that Montes-Valeton was driving under the influence of alcohol at the time of the car crash. The trial court denied the motion to suppress.

At trial, Trooper Molina testified that he did not detect the odor of alcohol while speaking to Montes-Valeton and that he could not recall whether Montes-Valeton appeared to be under the influence of alcohol. In response to questioning by defense counsel, Trooper Molina testified that

> whenever there's a DUI, we read you an implied consent, basically saying that as a law enforcement agency, we are requesting for either blood, urine, or breath to determine your alcohol contents or if there [are] any drug[] contents in your body. And if you refuse to submit to any of these tests, the State of Florida suspends your license for 12 months, 18 months i[f] you have [had your license] suspended before like that.

Trooper Molina further testified that he read an implied consent to Montes-Valeton, and that he explained Florida's implied consent law to Montes-Valeton. After the State rested, Montes-Valeton renewed all of his previous motions—including his motion to suppress—and moved for a judgment of acquittal. The trial court denied Montes-Valeton's motion for judgment of acquittal. The jury ultimately found Montes-Valeton guilty of DUI Serious Bodily Injury, a lesser included offense, and the trial court sentenced him to five years of incarceration.

Montes-Valeton appealed his conviction and sentence to the Third District. He claimed that the trial court erred by admitting the blood test results because Trooper Molina did not have probable cause to believe he was under the influence of alcoholic beverages before requiring him to submit to the blood draw as required by section 316.1933(1)(a). Montes-Valeton, 141 So. 3d at 207.

- 4 -

On appeal, the Third District affirmed Montes-Valeton's conviction and sentence. Id. at 209. The Third District concluded that "the record reflects that the law enforcement officer did not require [Montes-Valeton] to submit to the blood test" and "the law enforcement officer obtained the blood sample after [Montes-Valeton] voluntarily consented to the blood draw." Id. at 207. As an alternative holding, the Third District concluded that "even if [Montes-Valeton] had not 'voluntarily' consented to the blood draw . . . the blood draw was also supported by probable cause" under the fellow officer rule. Id. The Third District reasoned that

> although Sergeant Luis Tejera is the officer that smelled the odor of alcohol coming from [Montes-Valeton's] breath and determined that [Montes-Valeton] was the driver of the vehicle involved in this single-vehicle accident in which the passenger was ejected and was transported from the scene in serious condition, under the fellow officer rule, Trooper Molina had probable cause to request that [Montes-Valeton] provide the blood drawn by fire rescue.

Id. In doing so, the Third District cited this Court's explanation of the fellow officer rule in Voorhees. Id. at 207-08.

## II. ANALYSIS

We consider two arguments presented by Montes-Valeton related to the blood draw. First, we address the claim that the fellow officer rule was inapplicable because there was no communication between the officers concerning Montes-Valeton. Second, we consider the contention that the consent given by

- 5 -

Montes-Valeton was involuntary because it was given in response to coercive direction threatening punishment for refusal to consent by an officer lacking probable cause. The two arguments are interrelated. Because Montes-Valeton prevails on the first argument, he also prevails on the second one.

**A. Fellow Officer Rule**

We first address whether Trooper Molina had probable cause under the fellow officer rule. "In broad terms, the collective knowledge of police investigating a crime is imputed to each member under a rule of law often called the 'fellow officer rule' or 'collective knowledge doctrine.' " Johnson v. State, 660 So. 2d 648, 657 (Fla. 1995). The primary purpose of the fellow officer rule is "to assist officers investigating in the field to make arrests and conduct searches" because "an officer in the field may need to act immediately based upon what he or she is told by a fellow officer." State v. Bowers, 87 So. 3d 704, 707-08 (Fla. 2012) (emphasis added). "The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers." Voorhees, 699 So. 2d at 609.

In Voorhees, two men fled from Florida to Mississippi after committing a murder. Id. at 605. Thereafter, Mississippi officers offered both men a place to stay in the local jail on a cold and rainy evening in accordance with local custom. Id. Both men accepted and Voorhees provided the officers with a fictitious name.

Id. The next day, the officers ran a check on Voorhees' fictitious name and would not permit him to leave the jail until he provided his true identity. Id. at 605-06. Voorhees called a friend to confirm his fictitious name, but the friend instead notified the Mississippi officers that Pasco County officers were looking for Voorhees in connection with a murder. Id. at 606. The Mississippi officers then called the Pasco County Sheriff's Department which confirmed that Voorhees was wanted in connection with a murder. Id.

This Court found that "Voorhees' detention was legal beginning at the time that the Mississippi officers became aware that Voorhees and Sager were wanted for a murder in Pasco County." Id. at 610. Prior to this point in time, the Mississippi officers and their Pasco County counterparts were involved in unrelated investigations and had not engaged in any communications regarding the murder investigation. But once the Pasco County officers communicated the critical fact that Voorhees was wanted for murder to the Mississippi officers, the fellow officer rule applied and the detention of Voorhees by the Mississippi officers became legal. See id.

We reaffirm our holding in Voorhees that "[t]he fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers." Id. at 609 (emphasis added). Consistent with Voorhees, we recognize that the fellow officer rule does not allow an officer to

- 7 -

assume probable cause for an arrest or a search and seizure from uncommunicated information known solely by other officers.  Id.

The State argues that the fellow officer rule applies in this case simply because Sergeant Tejera engaged in "general communications" with Trooper Molina regarding the same investigation.  But this assertion is inconsistent with our case law.

> [The fellow officer rule] typically requir[es] a direct communications link between officers who possess probable cause and the arresting officer.  This often takes the form of a direct order that the arrest be effected, United States v. Woods, 544 F.2d 242 (6th Cir. 1976), cert. denied, 429 U.S. 1062 (1977), but also can consist of general communications among officers at least one of whom possesses probable cause.  United States v. Edwards, 885 F.2d 377 (7th Cir. 1989).

Johnson, 660 So. 2d at 657.  The officer conducting the search or arrest must be "act[ing] . . . based upon what he or she is told by a fellow officer."  Bowers, 87 So. 3d at 708.  Nothing in the record indicates that Sergeant Tejera or any other officer directed Trooper Molina to take a blood draw from Montes-Valeton, gave any indication that probable cause existed for such a blood draw, or communicated anything regarding Montes-Valeton to Trooper Molina.  Without the communication to the arresting officer of some information that initiates the arrest, the predicate for application of the fellow officer rule is lacking.  Trooper Molina therefore lacked imputed probable cause knowledge of Montes-Valeton's intoxication under the fellow officer rule.  See Edwards, 885 F.2d at 382 ("A

supervising officer's knowledge about a defendant cannot be relied upon to provide probable cause for his arrest where there is no evidence that such knowledge was communicated to the agents on the scene who actually made or ordered the defendant's arrest.").

## B. Voluntariness of Consent

We now address whether the blood draw was permissible because Montes-Valeton voluntarily gave his consent. "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973); see Bumper v. N. Carolina, 391 U.S. 543, 550 (1968) ("Where there is coercion there cannot be consent."). "The question of whether a consent is voluntary is a question of fact to be determined from the totality of the circumstances." Reynolds v. State, 592 So. 2d 1082, 1086 (Fla. 1992). "[I]t is not the presence or absence of any one factor alone that determines the validity of a consent. The question turns on the particular circumstances of each case." Id. at 1087. In the absence of an illegal detention or other illegal conduct on the part of police, "the voluntariness of the consent must be established by a preponderance of the evidence." Id. at 1086. "Where there is an illegal detention or other illegal conduct on the part of the police, a consent will be found voluntary only if there is clear and convincing evidence that the consent was not a product of the illegal police action." Id.

When examining the voluntariness of a person's consent under the totality of the circumstances, Florida courts have considered a non-exclusive list of factors including: (1) the time and place of the encounter; (2) the number of officers present; (3) the officers' words and actions; (4) the age and maturity of the defendant; (5) the defendant's prior contacts with the police; (6) whether the defendant executed a written consent form; (7) whether the defendant was informed that he or she could refuse to give consent; and (8) the length of time the defendant was interrogated before consent was given. See, e.g., State v. Hernandez, 146 So. 3d 163, 165 (Fla. 3d DCA 2014).

The State argues that Montes-Valeton voluntarily consented to the blood draw. We disagree. After asking Montes-Valeton to consent to a blood draw, Trooper Molina read the implied consent warnings that came with the blood draw kit to Montes-Valeton. The warnings threatened that a refusal would result in the suspension of his driver license. Trooper Molina further explained Florida's "implied consent law"[1] to him. But because Trooper Molina lacked probable cause

_____

1. The implied consent law consists of sections 316.1932, 316.1933, and 316.1934, Florida Statutes (2008), "which essentially require all persons accepting a license to drive in Florida to consent to a blood-alcohol test upon being arrested for driving under the influence." Robertson v. State, 604 So. 2d 783, 789 n.4 (Fla. 1992). The record before this Court does not provide full details concerning what Trooper Molina explained to Montes-Valeton regarding Florida's implied consent law.

to require the blood draw under section 316.1933(1)(a), neither the implied consent warnings nor Florida's implied consent law applied to Montes-Valeton. See, e.g., Robertson v. State, 604 So. 2d 783, 790 n.7 (Fla. 1992) ("[T]he implied consent statute . . . appl[ies] only when blood is being taken from a person based on probable cause that the person has caused death or serious bodily injury as a result of a DUI offense specified in the statutes."); State v. Murray, 51 So. 3d 593, 595 n.1 (Fla. 5th DCA 2011) ("Here, [the defendants] were not under lawful arrest and did not seek medical treatment, and the troopers did not have probable cause to believe that they were impaired. Consequently, the implied consent law was clearly not implicated."); State v. Burnett, 536 So. 2d 375, 377 (Fla. 2d DCA 1988) ("Here, the first requirement [of section 316.1932(1)(c)] was not met. Accordingly, section 316.1932(1)(c) was not applicable to this situation; therefore, the implied consent warning should not have been given to [the defendant]."). Montes-Valeton was thus improperly threatened with punishment.

The fact that Trooper Molina improperly threatened Montes-Valeton with the suspension of his driver license for refusing to give consent to the blood draw renders his consent involuntary. See, e.g., State v. Slaney, 653 So. 2d 422, 430 (Fla. 3d DCA 1995) ("[W]here, as here, a DUI arrestee consents to a blood withdrawal after being improperly advised that he will lose his driver's license if he fails to give such consent, the ensuing consent is involuntary in nature because

- 11 -

it was induced by a misrepresentation."); <u>see also</u> <u>Cooper v. State</u>, 587 S.E.2d 605, 612 (Ga. 2003) ("Consequently, the trooper completely misled [the defendant], albeit unintentionally, about his implied consent rights, and any consent based upon the misrepresentation is invalid."). Because of the coercion arising from the improper threat, Montes-Valeton's consent was involuntary.

## CONCLUSION

The Third District erroneously applied the fellow officer rule and erroneously concluded that Montes-Valeton voluntarily consented to the blood draw. We therefore quash the decision of the Third District and remand for proceedings consistent with this opinion.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, and POLSTON, JJ., concur.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Third District - Case No. 3D12-2063

(Miami-Dade County)

Richard C. Klugh, Jr., and John E. Bergendahl of Law Offices of John E. Bergendahl, Miami, Florida

for Petitioner

- 12 -

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Richard L. Polin, Bureau Chief, and Meghdut Robert Martinez Biswas, Assistant Attorney General, Miami, Florida,

for Respondent